# CHARLESTON.

WARD v. LIVERPOOL SALT & COAL CO.

Submitted October 24, 1916.    Decided December 5, 1916.

1. MASTER AND SERVANT—*Injuries to Servant—Relationship.*

   The general rule requiring the actual existence of the relation of master and servant, to sustain an action for personal injury received by one claiming to be the servant, due to the negligence of the alleged master, is not without its exceptions, and, under certain circumstances, there is liability, as if the relation existed, although in fact it does not.    (p. 376).

2. SAME.

   A corporation, chartered for the purpose of mining coal and producing salt and its bi-products, which engages in both occupations for a number of years, and then turns over to its president and general manager the business of mining coal on his own account, who does so in a fictitious name, but continues all the while president and general manager of the corporation, employing men to work in the mine, without disclosing whether for himself or his company, and paying them at the same place and in the same manner in which he pays employes in the salt works, thereby inducing them to believe they are employed by him as manager of the corporation, is liable to a miner for an injury occasioned by the negligence of such individual operator, as if the relation of master and servant actually existed between it and the injured employe.    (p. 376).

3. SAME—*Injuries to Servant—Vice Principal.*

   A mine foreman who, in addition to his statutory duties, and by authority of the operator, employs and discharges miners and has general charge of the mining operations, is, *pro tanto*, the agent of the operator, and renders it liable for his negligence in giving an improper order to a subordinate employe to throw a certain switch, thereby causing a train of empty coal cars, hauled into the mine and disconnected from the motor, while still in motion, to be diverted from the main entry onto a side entry and to collide with and injure a miner who, ignorant of the danger and in obedience to previous directions of such mine foreman, is shoving a loaded car from his place of work onto the siding.    (p. 380).

4. EVIDENCE—*Opinion Evidence—Competency.*

   In an action to recover damages for a personal injury the plaintiff, whose injury is internal, showing no visible evidences of permanency, is incompetent to give his opinion that the injury is permanent.    Only an expert is competent to express an opinion in such case.    (p. 381).

5. SAME—*Admissions—Writings.*

Where, in an action for personal injury sustained by plaintiff while working in a coal mine, defendant company denies it was operating the mine at the time of the injury, evidence is admissible to prove that the personal property, used in operating the mine, was listed for assessment and taxation in the name of the defendant, for the year within which plaintiff was injured and for some years prior and subsequent thereto, by its officer and agent, authorized to make return of its property to the assessor, as a circumstance tending to prove that defendant was then operating the mine.  (p. 383).

6. NEGLIGENCE—*Evidence—Admissibility.*

Where the evidence is clear and uncontradicted, respecting the particular negligence which caused the injury, testimony tending to prove negligence in other respects, which in nowise contributed to the cause of injury, is irrelevant, immaterial and should not be admitted.  (p. 383).

7. EVIDENCE—*Relevancy—Continuance.*

Testimony respecting previous continuances of the cause is irrelevant and immaterial to the issue to be tried by the jury.  (p. 384).

8. TRIAL—*Reception of Evidence—Documentary Evidence.*

A witness should not be permitted to read a paper to the jury as evidence, unless the paper itself has been admitted.  (p. 384).

9. SAME—*Instructions—Propriety.*

When the uncontradicted evidence shows that only one act of negligence was the proximate cause of the injury, an instruction submitting to the jury other alleged acts of negligence, not in any way contributing thereto, should be refused.  (p. 384).

10. MASTER AND SERVANT—*Injuries to Servant—Contributory Negligence.*

An inferior servant, injured while obeying the order of his superior who has control of the work, is not chargeable with contributory negligence, unless the danger incurred by such obedience is so great and imminent that a prudent person would not assume the risk.  (p. 384).

11. TRIAL—*Instructions—Jury Question.*

Where the liability of defendant company depends upon whether the mine foreman, whose negligence is shown to have been the proximate cause of the injury, was the agent of the master respecting such negligence, which, on account of conflicting testimony, is a mixed question of law and fact, an instruction, which would have told the jury such act was the negligence of a fellow servant, was properly refused.  (p. 384).

12.  SAME—*Special Interrogatories—Submission.*

Special interrogatories propounding to the jury certain questions which, if answered, could not control a general verdict, are properly refused.  (p. 384).

Error to Circuit Court, Mason County.

Action by Theodore Ward against the Liverpool Salt & Coal Company.  There was a judgment for plaintiff, and defendant brings error.

*Reversed and remanded.*

*Rankin Wiley* and *Chas. E. Hogg,* for plaintiff in error.

*Pendleton, Mathews & Bell* and *W. L. Poling,* for defendant in error.

WILLIAMS, PRESIDENT:

By this writ of error the defendant, Liverpool Salt & Coal Company, seeks reversal of a judgment recovered against it by the plaintiff, Theodore Ward, on account of injuries alleged to have been received by him while employed as a laborer in its coal mine.  The principal defense is, that defendant did not employ plaintiff, and was not the owner or the operator of the mine in which he was injured and is, therefore, not liable.  Defendant is a corporation, chartered under the laws of West Virginia in 1888, and owns and operates a salt works within two or three hundred yards of the coal mine, and also owns and conducts a general store near the coal mine.  It is admitted that it also operated the coal mine, under a lease from the land-owners, in connection with its salt works, up to the autumn of the year 1910, at which time, defendant contends, it ceased to operate the coal mine, and that since then it has been operated by A. E. Smith individually, in the name of The Jackson Coal & Mining Company. A. E. Smith is the owner of 130 of the 150 shares of the capital stock of the defendant company, and also the owner in fee of the coal that is being mined and other land contiguous thereto, having acquired title thereto from the land-owners in 1900 and 1901.  The defendant company began operating the coal mine in 1900, under a lease from C. E. McCulloch and P.

S. Lewis who were then owners of the land. After he acquired title from them, A. E. Smith says he received the rent or royalty up to sometime in 1910, which, he says, had theretofore been paid to McCulloch and Lewis. In 1907 he also purchased from A. L. Sehon and others another tract of 105 acres of land, including certain mining privileges and easements. That A. E. Smith was the owner of the land on which the coal mining operation was carried on, at the time plaintiff was injured and long prior thereto, is an established fact. It is also an admitted fact, that defendant company continued to operate the coal mine for many years after A. E. Smith became the owner of the coal, but no witness undertakes to fix the exact date when it ceased to operate it and A. E. Smith began operating it on his own account. There does not appear to have been any cessation in the operation, and the nearest approach, by any witness, to the time when the alleged change in the management of the coal mine occurred, is found in the testimony of A. E. Smith, who says he began selling coal on his own account sometime in the fall of 1910. Neither does it appear when, if ever, the lease under which defendant company operated was surrendered or canceled. A. E. Smith says he operated the mine in 1910, in the name of Jackson Coal & Mining Company which is not a corporation. He maintained a home in Cincinnati, and says he was much of the time away from the mine. He was, and is, president and treasurer of the defendant company, and his son Horace F. Smith is its secretary and also his father's private secretary, with authority to act for him in his absence. The personal property, used in the coal mining business, such as mules, mine cars and motors were listed by Horace F. Smith for assessment and taxation, for the years 1909 to 1914 inclusive, in the name of the Liverpool Salt & Coal Company. But the correctness of that listing is denied by A. E. Smith, who says it should have been listed in his name, or in the name of the Jackson Coal & Mining Company. The books of the Liverpool Salt & Coal Company, and the books of the Jackson Coal & Mining Company were kept by the same persons and in the same place. Employes, whether they worked in the coal mine or at the salt works, were paid by the same

person and in the same manner. In either case their accounts for goods purchased at the Liverpool Salt & Coal Company's store were deducted from their wages. The sign, "Liverpool Salt & Coal Company," was over the door of the office building adjoining the store room. Earl Ewing, superintendent of the coal mine, says he was employed by A. E. Smith, and he in turn employed John Roy as mine boss. There is evidence tending to prove that Roy was given power to employ men and assign them to places of work in the mine, and power to discharge them. He employed plaintiff and assigned him his place of work. Only members of the United Mine Workers of America were employed in the mine, and plaintiff says he joined the union about the time he began work. And defendant introduced in evidence an agreement with the United Mine Workers of America, dated June 17, 1912, governing the operation of the coal mine until May 17, 1914, which is signed "Jackson Coal & Mining Company by Horace F. Smith, secretary." But there is no evidence that plaintiff ever saw a copy of that agreement, or knew of its existence, unless testimony tending to prove that copies of it were posted about the mine, could be considered as evidence of such knowledge, and we hardly think such posting proves notice, in the absence of a statute making it such. It also introduced a number of stated accounts, rendered to various employes in the mine, which were made out in the name of the Jackson Coal & Mining Company, and a number of defendant's witnesses swear these forms were used at the time plaintiff was employed and afterwards. But there is no evidence that he ever saw, or received such a statement. All the copies that were introduced bore date in 1913, the year following plaintiff's injury, but the absence of any of an earlier date is accounted for by evidence of an unprecedented flood in the Ohio River in April 1913, which, it is claimed, destroyed all such papers.

At the time plaintiff was injured he and his helper, Oris Dodson, were pushing a car of coal out of the room in which they were working, onto a side entry, and plaintiff was caught between the loaded car and a train of empties which had been hauled in by a motor on the main entry. Before reaching

the side entry which led to the room where plaintiff was working, the motor was cut loose and driven past the switch, and the switch was thrown, before the trip reached it, and the trip of empties carried onto the place where plaintiff and his helper were pushing the car, by the momentum previously imparted to it. It appears to have been done in the manner of what is known among railroad operatives as making a flying switch. That part of the mine was not lighted, nor were there any lights on the trip of cars. Holly Hudson, another employe in the mine, threw the latches which operated the switch that guided the empties onto the side entrance, and says he was instructed to do so by John Roy, the mine boss, but Roy denies this.

Negligence in the following particulars is averred as the cause of plaintiff's injury, viz.: (1) failure to provide and maintain safe haulways, tracks, tools, machinery and appliances; (2) failure to provide any system of signals, or conspicuous lights, such as lights in the mine for the protection of plaintiff and others employed there; (3) failure to provide lights on the front and rear of trips of cars coming into the mine; (4) failure to employ a competent and practical inside overseer or mine boss; (5) permitting the switch to be and remain out of repair; and (6) permitting debris to accumulate along the sides of the track, thereby making it dangerous and unsafe to work on, or along it.

Counsel for defendant insist that it is not liable, unless it was actually operating the mine at the time plaintiff was injured, and was his employer; that the evidence conclusively proves it did not employ him and was not the owner or operator of the mine at the time of his injury. That it was not the owner must be taken as an established fact. Evidence that A. E. Smith is the owner is conclusive in character and is not contradicted. But defendant's liability does not depend upon ownership. Liability, in cases of this kind, generally depends upon proprietorship and control of the operation, and whether or not the relation of master and servant actually exists between the party sued and the party injured. But this rule has its exceptions. There are circumstances and conditions under which a person, not actually the master

or employer, may be held liable, as if he were such. He may occupy the position of agent for an undisclosed principal, and become liable on that score, *Morris & Co.* v. *Malone,* 200 Ill. 132, 93 Am. St. Rep. 180; *McClure* v. *Detroit Southern R. Co.,* 146 Mich. 457; *Malone* v. *Morton,* 84 Mo. 436; or, if the relation is shown to have existed, liability may continue after its severance, if the employer has failed to inform the servant of the change of masters; *State of Maryland, for use etc.* v. *Trimble et al.,* 104 Md. 317; or, liability may rest on the ground that the injured party was a servant to do a particular work, although he was the general servant of another who employed and paid him. This principle is exemplified by the case of *Delaware, Lackawana & Western R. R. Co.* v. *Hardy,* 3 Vroom, (N. J. L.), 35, and is ably discussed in the opinion, and sustained by the authorities therein cited. One may also be liable even though the relation did not actually exist, on the ground of holding himself out as the master in such manner as thereby to induce the injured employe to believe he was his servant. This principle was applied in the following cases: *M. K. & T. Ry.* v. *French,* 18 Tex. Civ. App. 46; *Goldman* v. *Mason,* 2 N. Y. Supp. 337; and *Solomon R. R. Co.* v. *Jones,* 30 Kan. 601. The case, last cited, is directly in point. There plaintiff was injured while engaged in surfacing the track on defendant's line of railroad, and, in an action against the railroad company, recovered damages. It was contended in that case, as it is in this, that the plaintiff was not a servant of the railroad company at the time of his injury, that he had not been employed by it, that the relation of master and servant did not exist, and that, therefore, it was not liable. It there appeared that the work, at which plaintiff was engaged, was done under contract let to one J. P. Usher, one of the largest stockholders in the railroad company, and made on behalf of the railroad company by its president, D. M. Edgerton, acting under authority of a resolution passed at a stockholders' meeting, authorizing him to make such arrangements and contracts as might be necessary, subject to the approval of the board of directors, for the construction of the road from Solomon City to Beloit. Later, Usher assigned the contract to said Edgerton, and the assign-

ment was ratified and confirmed by the directors. Edgerton continued as the president of the new railroad company, until after the injury to plaintiff, and was also vice-president of the Kansas & Pacific Railway Company, to which company, it was contended, the new railroad had been turned over, by the Solomon Railroad Company, nine days before plaintiff's injury, and there was evidence to support that contention. Neither the contract nor its assignment to Edgerton was made public, and the employes had no knowledge of its existence. Edgerton, president of the corporation, was the ostensible and active agent in the construction work. Some of the superintendents and principal men on the work testified, that they were employed by the Kansas & Pacific company, had no other employment and were sent by it to take charge of the new construction work. Some payments were made in Kansas & Pacific checks and some by Edgerton personally. From the foregoing, and other minor facts, Judge Brewer who delivered the opinion, in which all the judges concurred, reached the conclusion, that the Kansas & Pacific was really the builder and owner of the road, but that, for reasons not disclosed, it caused the creation of the defendant corporation and in its name built the road. "But," says the learned judge, "there are two good reasons why the jury were justified in holding the defendant as the party responsible in this matter. Where a corporation is organized for the purpose of doing any work, the work will be presumed, in the absence of any showing to the contrary, to be done by it, and it will be held responsible for all that transpires. * * * *. * * Again, where the president of a corporation appears as the active agent in the execution of a work, all parties employed by him have a right to assume that he is acting for the corporation, and that his acts are its acts and binding upon it. It is not to be presumed that he is an independent contractor. Perhaps a different rule might obtain in the case of a third party, one having no contractual relations with the work. As to that question, it will be time enough to consider it when it arises. Here the plaintiff stood in contractual relations to the work. Nothing was public save the franchise, the doing of the work, and the ac-

tive agency of the president in such work. The employes understood they were working for the company, and had a right to regard it as the principal, and hold it responsible for payment of wages and negligence in the management of affairs.''

Coal mining was one of the things for which defendant company, in the present case, was chartered, and for many years it carried on that business, as well as the production of salt and its bi-products, and also kept a general store. There is evidence that the employes, whether working in the coal mine or at the salt works, were paid in the same manner, at the same office and by the same person. Apparently plaintiff did not know for whom he was actually employed. He was employed by the foreman of the coal mine, and did not know who was the actual operator. Why Mr. A. E. Smith desired to carry on the mining business in a fictitious name, suggestive of a corporation, rather than in his own name is not disclosed. A. E. Smith was the holder of nearly all the capital stock of defendant company, and was also its president and general manager, and therefore, when men were employed by him, or his agents, to work in the coal mine they had a right to assume that he engaged them in his capacity of general manager of defendant company. The following cases are also apropo, viz.: *Goldman* v. *Mason,* 2 N. Y. Supp. 337; *M. K. & T. R. R. Co.* v. *French,* 18 Tex. Civ. App. 46; and *Morgan* v. *Smith,* 159 Mass. 570. The supreme court of California, in *Smith* v. *Belshaw,* 89 Cal. 427, is the only authority that we have been able to find which goes to the extent of holding, that the relation of master and servant must actually exist before there is liability. The supreme court of Iowa, in *Johnson* v. *Owen,* 33 Iowa 515, recognizes the principle herein decided. The question was not presented in the cases of *Fickeinsen* v. *Electrical Co.,* 67 W. Va. 335, and *Perry, Admr.* v. *Ohio Valley Electric Railway Co.,* 70 W. Va. 679, which cases are cited and relied on by counsel for defendant. The question presented in each of those cases was as to which one of two electrical companies, one the producer of electricity and the other the purchaser of the current for use by its patrons supplied to them over its own

wires, was responsible for injury to third persons, not employes of either of them. Although the jury may have been justified in believing A. E. Smith was, in fact, the owner and operator of the coal mine at the time of plaintiff's injury, they, nevertheless, could find against defendant company, if they believed from the evidence it so conducted its business as to deceive plaintiff and cause him to believe that it was the operator.

It is also contended that no actionable negligence is proven. John Roy was employed as mine foreman by Earl Ewing the general superintendent of the mine. Ewing says he was employed as superintendent for the ''Jackson Coal & Mining Company,'' by A. E. Smith. He was asked if said company was a corporation, and his reply was: ''Well, it is A. E. Smith; I suppose it is just an individual.'' He was asked, on cross-examination, how he knew A. E. Smith was the Jackson Coal & Mining Company, and replied: ''I got my orders from him, and I suppose he owned it.'' Ewing says he sent men to Mr. Roy, when they wanted employment in the mine, and John Roy admits he employed plaintiff and Holly Hudson both to work in the mine, and they also testify to the same fact. Holly Hudson swears he was instructed by John Roy to throw the switch as he did, which caused the trip of empty cars to run in on the siding and injure plaintiff. Roy denies he so instructed him, but, upon their conflicting statements, the jury must have found the fact to be as Hudson stated. We have frequently held, that a statutory mine foreman, who is authorized by the mine operator, or his agent, to employ and discharge men, and direct their operations in the mine is, pro tanto, the agent of such operator. *Ewing* v. *Lanark Fuel Co.*, 65 W. Va. 730; *Sprinkle* v. *Big Sandy Coal & Coke Co.*, 72 W. Va. 358; and *Gartin* v. *Draper Coal & Coke Co.*, 72 W. Va. 405, 78 S. E. 673. Hence, Roy's direction to Hudson to throw the switch, which he did in apparent ignorance of the probable consequences and without warning to plaintiff, as the evidence tends to prove, was an act of negligence, attributable to the operator. It is not the mine forman's duty to superintend and direct the operations of the laborers in the mine, and if he

does so, with the knowledge and consent of the operator, he becomes his agent with respect to the master's non-assignable duties to his servants. We recently held in *Haptonstall* v. *Boomer Coal & Coke Co.*, 78 W. Va. 412, 89 S. E. 723: "Where a mine foreman in addition to his statutory duties is also the duly authorized representative of the owner or operator of a coal mine, in employing and discharging miners and assigning them to their places of work in the mine, and who negligently and without notice or warning assigns one of said miners, ignorant thereof, to work at a place suddenly become dangerous and known to him to be dangerous, the owner or operator is liable in damages for consequential per-·sonal injuries sustained by the miner, due to no fault on his part."

That rule forcefully applies to the facts, supported by the testimony of several witnesses in this case, and which the jury must have found therefrom to exist.

Numerous exceptions were taken, throughout the trial, to the admission of alleged improper testimony, over the objections of defendant, and to the alleged improper exclusion of relevant and material evidence offered on behalf of defendant. These exceptions are noted in various places throughout the testimony, certified in bill of exceptions No. 1, and the court's rulings respecting such evidence are assigned as error. Plaintiff's injury was internal and in the lumbar region. The case was tried more than two years after he was hurt and he testified that he still suffered pain from the hurt received in the mine, and was not able to work at his carpenter's trade, and was not able to walk without a cane. He also testified that he was so badly hurt that he was rendered unconscious at the time, was taken home and was confined to his bed for eight or ten days and was treated by a physician. There were no external wounds or bruises on his body and no broken bones. He proved that, prior to his injury in the mine, he was a hearty, robust man, and that, since his injury, he has suffered a good deal of pain, that for a long time he was unable to walk without crutches, and was then unable to walk without a cane, and that the injury still caused him much pain and suffering. Having so testified,

he was then asked by his counsel if, in his opinion, his injury was permanent, and, over the objection of counsel for defendant, was permitted to answer that, from his present suffering, it was permanent.

Plaintiff was not competent to give his opinion on that point. Only an expert familiar with the human anatomy and possessed of scientific knowledge respecting diseases, would be competent to give opinion evidence respecting the permanency of such an injury as plaintiff received. This case is not within the exception to the general rule respecting opinion evidence, as stated in *State* v. *Welch,* 36 W. Va. 690, and followed in *Findley, Admr.* v. *Coal & Coke Ry. Co.,* 72 W. Va. 268. *Atlanta Street Railway Co.* v. *Walker,* 93 Ga. 462, is a well considered case, exactly in point. There the plaintiff, a driver, was thrown from his wagon and injured by the negligence of defendant. After describing his condition and the pain which he had constantly endured since his hurt, he was allowed to give his opinion that his suffering would be permanent. The appellate court held his opinion to be inadmissible, and reversed the case. After hearing plaintiff's testimony, respecting all the characteristics and symptoms of his injury and his suffering therefrom, the jury could more safely form an opinion, respecting the permanency, than plaintiff himself. Quoting from the opinion of the court in the case cited: "Scarcely anything is less reliable than a sick plaintiff's opinion of his own case when he is in pursuit of damages." In that case plaintiff's opinion was held to be inadmissible, notwithstanding a state statute declaring that, "Where the question under examination and to be decided by the jury is one of opinion, any witness may swear to his opinion or belief, giving his reasons therefor." So firm and universal have been the rulings of the courts respecting the incompetency of non-expert witnesses to express an opinion on matters not within common knowledge, that the court, in construing the statute, limited its application to such matters as come within the range of common opinion. All text writers recognize opinion evidence of the character here discussed as competent only when given by experts. 1 Elliott on Evidence, sec. 679, and note; 1 Greenleaf on Evi-

dence, (16th ed.), sec. 430(c); and 2 Jones on Evidence, sec. 360, and note. Plaintiff's opinion as to the permanency of his injury being incompetent evidence, the presumption is that its admission was prejudicial. The physician who attended plaintiff when he was hurt was examined in his behalf, and was, no doubt, qualified to express an opinion as to whether plaintiff's injury was permanent, but he was not asked to do so.

Again, Mr. Crump the assistant assessor of Mason county who assessed the property in the district wherein the mine is situate, in 1913-1914, was permitted, over defendant's objection, to read from a paper containing a list of the property then used in the coal mine, listed in the name of the Liverpool Salt & Coal Company and to which the name of A. E. Smith was signed by H. F. Smith as attorney. The paper was submitted to opposing counsel for inspection before the witness read from it, and the paper itself having been later admitted as evidence, defendant could not have been prejudiced by the witness' reading its contents to the jury.

Louie Grimm, a witness for plaintiff, after having stated he saw but two refuge holes along the main entry, was asked how far they were apart, and, over the objection of defendant's counsel, was permitted to answer, and answered as follow: ''I do not know exactly how far they was apart, I expect forty or fifty feet, *that* may have farther than that.'' This testimony was irrelevant, and could have no other effect than to confuse the jury respecting the proximate cause of plaintiff's injury. Assuming that it was the operator's duty, as well as the duty of the mine foreman, to provide refuge holes along the haulway, although a majority of this court held in *Bralley, Admr.* v. *Tidewater Coal & Coke Co.,* 66 W. Va. 278, that the failure to perform the duties specially enjoined upon the mine foreman by statute was not negligence attributable to the operator, still there is not the slightest evidence tending to prove that the failure to provide a sufficient number of refuge holes, along the main haulway, constituted any part of the proximate cause of plaintiff's injury. He was injured at a room along one of the side entries, according to his own testimony, and not be-

cause of the lack of refuge holes in the main entry. So that,. even if it be admitted defendant was derelict in this respect,. such was not the proximate cause of plaintiff's injury, and the testimony was, therefore, irrelevant and inadmissible.

Exception was taken to the admission of the circuit clerk's testimony respecting the time this suit was instituted. His testimony related to matters of record, and it does not appear that the record was introduced. If it had been, the witness. could then have been permitted to read from it. Later, the same witness was permitted to read from the order books, an order entered on October 18, 1913, continuing the case, on defendant's motion and at its costs. This evidence was immaterial and irrelevant, and should not have been admitted. It threw no light upon the issue. However, if its admission. were the only error, we do not say we would reverse for that reason.

For the same reason the court should have sustained defendant's objection to the question propounded to A. E. Smith, a witness for defendant, on cross-examination, asking him if he had not applied to the court, a year before, for a continuance, on account of the absence of Horace F. Smith, and if he did not then state, that Horace F. Smith was sick and it was unsafe for him to attend the trial. While this. may not be prejudicial error, because of the witness' answer, that he did not remember whether he made the statement or not, still the testimony was immaterial and irrelevant, as having no bearing upon the issue to be tried by the jury, and should not have been admitted. Previous continuances, and the cause therefor, were not matters affecting the issue, and the only effect the testimony could have had was to prejudice defendant's cause, by creating the impression that it was unwilling to submit to a trial.

Plaintiff asked for thirteen instructions, to all of which defendant objected. The court gave all of them except his No. 3, and defendant excepted, and assigns the giving of them as error. The first part of No. 1 presents an abstract question of law, concerning defendant's duty in respect to providing plaintiff a reasonably safe place in which to work. However, the chief fault in the instruction is, that it submits:

to the jury the questions, whether, from the evidence, the entry in the mine where the plaintiff was injured was a reasonably safe place to work, and whether plaintiff received his injury because of its unsafe condition, and without fault on his part, and instructs them to find for plaintiff, if they find such entry was unsafe and caused his injury. In view of all the testimony in the case, concerning the manner in which plaintiff was injured, this instruction was confusing and misleading and should not have been given. There is no evidence that he was injured because of the unsafe condition of either the main, or the side entrance, or of the room in which he was working. The only negligent act, which could be regarded as the proximate cause of plaintiff's injury, as shown by the evidence, was the negligent operation of the trip of cars that collided with him. There is no evidence that the condition of the entry had anything to do with this, or in anyway was a contributing cause to his injury.

His No. 2 relates to the quantum of damages, and authorized the jury to "take into consideration the mental and physical pain and suffering endured by the plaintiff since he received the injury complained of, in consequence thereof, the character and extent of such injury," which, to that extent was proper. But, the instruction proceeds, "and its continuance, if permanent," which was improper. There was no evidence that his injury was permanent, except his own opinion which we have held was not competent testimony. There was, therefore, no evidence to support a verdict for damages for a permanent injury.

His No. 5 was concerning contributory negligence, and told the jury plaintiff was excusable for obeying the orders of his master, or of the person placed in authority over him by the master, unless the danger to be incurred by such obedience was so manifest that a prudent person would not attempt to obey, and then continues as follows: "and though there be apparent danger in obeying the master's orders, yet such knowledge on the part of a servant will not defeat a recovery, if the danger is not glaring and such as threatens immediate injury." This instruction is supported by *McClary* v. *Knight*, 73 W. Va. 385; and 4 Labatt on Master & Servant,

(2nd ed.), sec. 1362, and was properly given. The objection urged against the instruction is, that there was no evidence that plaintiff's injury was the result of obedience to the orders of a superior servant. But counsel are mistaken in that respect. Plaintiff testified that, at the time he was injured, he was pushing a loaded car out of his room onto the siding, and the jury may have considered that as an act of negligence on his part, inasmuch as there was evidence tending to prove that the cars, after being loaded, were hauled out with mules. Plaintiff testified that he had been directed by John Roy to push the loaded cars out of his room.

We find no fault with the remaining instructions given on behalf of plaintiff.

As the judgment must be reversed and the case remanded for a new trial for errors already pointed out, it is proper to consider the instructions given on behalf of defendant, as well as those asked for by it, which were refused. It requested seventeen instructions, of which its Nos. 4, 9, 11 and 12 were refused because of plaintiff's objections thereto, and defendant excepted. Its No. 4 was to the effect, that defendant's liability depended upon the actual existence of the relation of master and servant between it and plaintiff, at the time of the injury, and that although the jury was satisfied, from the evidence, that plaintiff believed the mine was being operated by defendant, still, if they were convinced by the evidence that it was not operated by it, they should find for the defendant. This instruction is contrary to the principle herein decided, and was properly refused.

No error was committed in refusing No. 9, because its effect was to tell the jury, that the act of Holly Hudson in throwing the switch, which caused the trip of empty cars to be diverted onto the side entry and to collide with plaintiff, in obedience to the directions of John Roy, was the negligent act of a fellow servant, for which defendant was not liable. In view of the evidence, tending to show that the authority exercised by said Roy over other employes, in the conduct and operation of the mine, the jury had a right to decide whether he was defendant's agent or vice-principal, and the right to determine also that, if Hudson was ignorant of the conse-

quences liable to result from obeying his orders, he was, in law, only an innocent intermediary in causing the injury.

No. 11· was· properly refused because it would have submitted to the jury questions of law.  It would have required them to determine whether the injury was occasioned by the mine foreman's omission to perform some one of his numerous statutory duties without having informed them what those duties were.  There was no conflict in the testimony respecting the manner in which plaintiff was injured, or the instrumentality that produced it.  No theory of the case presents more than two questions of fact necessary to be determined by the jury, in order to ascertain whether defendant is liable: (1) was Holly Hudson directed by John Roy to throw the switch?  This controverted fact was properly submitted to the jury by defendant's instruction No. 10, which was given.  And (2), what relation did John Roy sustain to defendant, in giving the order, if he did give it?  In view of the uncontradicted testimony respecting the authority which he was permitted to exercise over the subordinate employes in the mine, Roy's relation to the mine operator was more a question of law than a question of fact.

No. 12 was lengthy and complicated, and would have confused the jury respecting the act of negligence which was the proximate cause of the injury, but concerning which there is no conflict in the testimony.  The only question to be determined, being the matter of responsibility for the negligent act of causing the switch to be thrown, is a mixed question of law and fact, depending altogether upon the conflicting testimony as to whether Hudson was ordered by Roy to throw it and upon Roy's relation to defendant.  It would also have told the jury that, if they believed the injury occurred, on account of the failure to provide proper signals of warning, such negligence was the negligence of the mine foreman, for which defendant was not liable.  The statute does not make it the mine foreman's duty to provide signals of warning in entries where the hauling is not· done by machinery, and the uncontradicted testimony proves that the cars were hauled by mules over the side entry where plaintiff was hurt, and not by machinery.

Defendant's instructions 1a, 3, 7, 13 and 16 were given apparently without objection by plaintiff. They conflict with plaintiff's No. 10, which was also given, and which we have approved. By giving them the court instructed the jury that they could not find for plaintiff, unless they found from the evidence that defendant was, in fact, operating the coal mine, at the time plaintiff was injured, and the relation of master and servant actually existed, whereas we have decided there is liability, even though that relation did not exist, if defendant so conducted its business as reasonably to cause plaintiff to believe, and he did so believe, that he was employed by, and was the servant of defendant at the time he was injured.

Nos. 5 and 6 are of doubtful propriety, at least, and should have been qualified by some such provision as, "unless the jury believe such acts of H. F. Smith, as secretary of the Liverpool Salt & Coal Company, or of E. A. Smith, vice-president of said company, respecting the management of said company, were such as would reasonably induce the belief that defendant was operating the mine, and did cause plaintiff to believe he was employed by it."

No. 17 should not have been given. In view of the principle on which we have determined defendant may be liable even though it was not plaintiff's master at the time he was injured, it was not proper for the court to separate one or two important facts, from the numerous ones testified to by witnesses and all of which were necessary to be considered by the jury on the question of liability, and instruct the jury that the particular facts, so singled out, were not alone sufficient to establish liability.

The refusal of the court to submit to the jury the four following special interrogatories is assigned as error: (1) "Who was the owner and operator of the Coal Mine in which the plaintiff was injured at the time he received his injury? (2) When did the person who owned the mine at the time of the injury acquire the ownership of the mine in which the plaintiff was injured and how did he acquire such ownership? (3) If the plaintiff was injured by the negligence of the defendant, in what did the act or acts consist? and

(4) If the plaintiff was in the employ of the defendant at the time of his alleged injury, by what officer or agent of the defendant was he employed?'' The answer to none of these questions would have controlled the general verdict unless, possibly an answer to the third might have controlled, and it was the very question presented by the main issue made by the pleadings. The court, therefore, properly refused to submit them to the jury.

Our conclusion necessitates a reversal of the judgment and a setting aside of the verdict, and such will be the order of this court, and the cause will be remanded for a new trial.

*Reversed and remanded.*